**Patricia D. RUSH, Plaintiff–Appellant,**

v.

**McDONALD'S CORPORATION, Sharon Funston, and William R. Rose, Defendants–Appellees.**

No. 91–2151.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1992.

Decided June 29, 1992.

Carolyn C. Coukos (argued), Indianapolis, Ind., for plaintiff-appellant.

Mark W. Ford and Andrew W. Hull (argued), Johnson, Smith, Densborn, Wright & Heath, Indianapolis, Ind., for defendants-appellees.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and BURNS, Senior District Judge.*

RIPPLE, Circuit Judge.

Mrs. Patricia Rush, a black woman, was employed by the McDonald's Corporation at its Indianapolis regional office, as a word processing specialist, first part-time, and later full-time, from November 1985, until May 1988, when she was fired. She subsequently brought an action in the United States District Court for the Southern District of Indiana, against McDonald's and two of her supervisors. She alleged violations of Title VII of the Civil Rights Act of 1964,[1] of section 1981 of the Civil Rights Act of 1870,[2] of the Employee Retirement Income and Security Act of 1974 ("ERISA"),[3] and of Indiana common law. The district court granted the defendants' motions to dismiss certain portions of the complaint and for summary judgment as to the remainder of her action. It also imposed sanctions under Rule 11 on Mrs. Rush's attorney. We affirm.

## I

## BACKGROUND

A. *Facts*

Mrs. Rush was first hired by McDonald's in November 1985, as a part-time word

---

* The Honorable James M. Burns, Senior District Judge for the United States District Court of Oregon, is sitting by designation.

1. 42 U.S.C. § 2000e *et seq.*

2. 42 U.S.C. § 1981.

3. 29 U.S.C. § 1001 *et seq.*

processor. Mrs. Rush preferred a full-time position, since part-timers were paid a lower hourly rate and received fewer employee benefits.[4] She expressed that interest to various supervisory personnel on a number of occasions. However, the Indianapolis office did not have a full-time vacancy until the end of 1987. At that time, Mrs. Rush applied for that position, and she was promoted to full-time status effective January 1, 1988. During the period that Mrs. Rush was employed on a part-time basis, she was twice subject to disciplinary action.[5]

On Monday, May 2, 1988, Mrs. Rush did not report to work. In an affidavit, Mrs. Rush stated that she had had a scalp problem for several months, and that, on that particular day, it manifested itself as a severe case of dandruff. Not only was she embarrassed by her situation, but she feared that this condition would put her in non-compliance with McDonald's' employee appearance standards. Because Mrs. Rush did not have a telephone at her home, she asked her husband, Arthur Rush, to call the McDonald's office to tell her immediate supervisor, Sharon Funston, of her unavailability. However, because of the personal nature of her condition, she instructed her husband not to give the reason for her absence from work.

The McDonald's regional office had a written attendance policy which required, among other things, that an employee who was unable to report to work should notify the office manager or leave a message at her office. On the other hand, the McDonald's office apparently did not have any written policy which provided for the discharge of employees for unexplained absence. Mrs. Rush acknowledged that she was aware of the attendance policy. She alleges that because she did not have a telephone at her residence, she had permission from Ms. Funston to have her husband call in for her; McDonald's disputes that assertion. At the summary judgment stage, we accept the nonmoving party's (here, Mrs. Rush's) version of the facts.

On Tuesday, May 3, the plaintiff again asked her husband to call Ms. Funston, and this time to tell her that Mrs. Rush would be back at work on Thursday. As on the prior day, Ms. Funston again expressed her concern to Mr. Rush as to the reasons for and the duration of his wife's absence, because she felt the need to have Mrs. Rush's work assignments completed.[6] On Wednesday, May 4, Mrs. Rush called the McDonald's office personally; after several missed connections, she finally spoke to Ms. Funston that afternoon,[7] and agreed to come to the office the next day. Mrs. Rush finally reported to work on Thursday, May 5. She met with Ms. Funston and, after a brief discussion,[8] was given a written notice of termination of employment.

4. The salary range of part-time employees was about 85% that of full-timers. Part-time employees were not entitled to sick leave, personal leave, holidays, a vacation plan, group health insurance, disability benefits, voluntary employee physical exams or participation in McDonald's' stock option plan.

5. In December 1986, Mrs. Rush received a warning of unprofessional conduct, which was the outgrowth of an argument she had with a co-worker. (The parties agree that Mrs. Rush received a verbal warning. McDonald's also asserts that she received a written warning; Mrs. Rush disputes this contention.) In February 1987, Mrs. Rush received a three-day suspension from work for insubordination and failure to follow management instructions, as a result of an argument with the Indianapolis office manager.

In addition, in June 1987, McDonald's' personnel manager, Sherri Flinn, spoke to Mrs. Rush about her "grooming" habits and the effect that failure to make certain corrections might have on her opportunities for promotion. We discuss the implications of these disciplinary actions *infra* nn. 36–37 and accompanying text.

6. McDonald's made arrangements for a temporary employee on both Monday and Tuesday, to do some of Mrs. Rush's work.

7. This conversation is in dispute. The defendants assert that Mrs. Rush did not speak to Ms. Funston until Thursday morning. Since it appears undisputed that Mrs. Rush at least attempted to contact Ms. Funston on Wednesday, we do not treat this dispute as material. In any event, we accept Mrs. Rush's version of the facts at this stage.

8. In that discussion, Mrs. Rush explained the reason for her absence from work. She indicated that she had not sought medical treatment for her condition, but instead had visited a hairdresser, in part to see if her shampoo was a cause of her dandruff.

### B. *Proceedings Below*

On June 9, 1988, Mrs. Rush filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC").[9] The complaint was referred to the Indiana Civil Rights Commission; on April 6, 1989, that agency rendered its findings, concluding in part that "Complainant's allegation of a discriminatory practice by Respondent in the area of employment on the basis of race when Complainant was discharged is found to be without merit." On May 23, 1989, the EEOC issued a Notice of Right to Sue to Mrs. Rush.

Mrs. Rush filed her initial complaint with the district court on August 18, 1989. In addition to naming McDonald's as a defendant, she also sued Ms. Funston and the McDonald's regional manager, William Rose.[10] Mrs. Rush alleged that she was the subject of racial discrimination while she was an employee and in her eventual discharge. Her complaint generally asserted a number of theories under both federal and Indiana law.

A variety of motions directed to the pleadings followed. In response to a motion for a more definite statement, the plaintiff moved for leave to file an amended complaint. Her motion was granted, and a second complaint was filed on December 21, 1989. While the initial complaint was rather unspecific, this amended complaint contained five counts, identifying a number of respects in which the defendants' conduct allegedly violated various statutory and common law duties.

Specifically, in Count I, Mrs. Rush asserted five forms of race-based discrimination in violation of Title VII: (a) her discharge; (b) denial of promotion from part-time to full-time status; (c) denial of employee benefits; (d) harassment, including racial comments and disparate treatment; and (e) adoption of a policy of filling the word processor position with minorities and of hiring minorities on a parttime basis more frequently than non-minorities. Count II asserted a claim under section 1981, alleging that the delay in promoting her from a part-time to a full-time position was the product of racial considerations. Count III asserted an ERISA claim, based on the wrongful denial of employee benefits. Count IV alleged a claim of racial discrimination resulting in her wrongful discharge; this claim was based on Indiana public policy, which in turn was assertedly derived from the Indiana Civil Rights Law.[11] Count V asserted a state law claim of intentional infliction of emotional distress, which resulted from Ms. Funston's alleged racial harassment of the plaintiff.

On June 5, 1990, the defendants moved to dismiss portions of the amended complaint.[12] In response, plaintiff made a motion on July 25, 1990, for leave to file a second amended complaint.[13] After the defendants pointed out in their opposing brief that this motion came six weeks after the cut-off date set by the Pre–Trial Scheduling Order for filing such motions, the plaintiff filed a motion on August 23, 1990, to enlarge the time to file a motion for leave to amend the complaint.

The plaintiff's two state law claims were abandoned in mid–1990. Mrs. Rush first made a motion on June 1, 1990, seeking leave to dismiss Count V without prejudice;

---

**9.** In her charge, she stated:

I began my employment as a Part-time word processor on November 11, 1985. I became a Full-time word processor on January 1, 1988. On May 6, 1988, I was told by Sharon Funston, Supervisor that I was being terminated. I believe that I have been discriminated against because of my race, Black.

**10.** Mr. Rose also had overall supervisory responsibility for the office in which Mrs. Rush worked.

**11.** Ind.Code § 22–9–1–1 *et seq.*

**12.** At this same time, the defendants also made a motion for Rule 11 sanctions. The defendants filed a motion for sanctions under Rule 16(f) on August 16, 1990.

**13.** The original and the first amended complaint had made no reference to any specific section of ERISA on which the claim was predicated. During the early stages of the litigation, Mrs. Rush had been proceeding on the basis of a violation of ERISA § 502 (29 U.S.C. § 1132); the second amended complaint sought to make clear that plaintiff instead relied on ERISA § 510 (29 U.S.C. § 1140).

the district court granted this motion on June 5, 1990. After the defendants made a motion requesting reconsideration of this order, the court amended the order on June 11, 1990, to provide that this claim was dismissed "with prejudice." Then, on August 28, 1990, counsel for the parties entered into a stipulation for the dismissal of both Counts IV and V.[14]

On November 12, 1990, the defendants filed a motion for summary judgment. By an order dated April 12, 1991, the district court, after first noting the untimeliness of plaintiff's motion, nonetheless granted her permission once again to amend the complaint. Considering the action on the merits, the court granted the defendants' motion pursuant to Rule 12(b)(6) as to three of her Title VII claims [15]—those asserting denial of benefits, racial harassment, and McDonald's' alleged policy of slotting minorities into parttime positions—and granted summary judgment as to the balance of her claims. *Rush v. McDonald's Corp.*, 760 F.Supp. 1349 (S.D.Ind.1991).

The defendants had filed two separate motions for sanctions, pursuant to Rule 11 and Rule 16(f).[16] Finding that Mrs. Rush's complaint contained frivolous claims, the court concluded that the imposition of some sanctions under Rule 11 was required. Although the court determined that the imposition of attorney fees was excessive, it concluded that both monetary and nonmonetary sanctions were appropriate. The court therefore ordered a reprimand of Mrs. Rush's attorney and the award of costs against her and in favor of the defendant.[17] Mrs. Rush filed a timely notice of appeal, challenging the dismissal of certain

of her claims and the entry of summary judgment with respect to the rest.[18] Mrs. Rush's attorney appeals the entry of sanctions under Rule 11.

## II

### ANALYSIS

#### A. *Standard of Review*

This case comes to us on appeal from a trial court's entry of summary judgment. By now, it is standard learning that summary judgment should be entered when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1477 (7th Cir.1990). Furthermore, once the moving party has demonstrated the absence of any genuine factual issues, the nonmoving party may not simply rest upon the allegations or denials in her complaint, but must present specific facts showing that there really is a "genuine" issue open for trial. *Celotex*, 477 U.S. at 322–26, 106 S.Ct. at 2552–54; *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). "Summary judgment will not be defeated simply because issues of motive or intent are involved, and is proper when the plaintiff fails to indicate any motive or intent to support plaintiff's position." *Morgan v. Harris Trust & Savings Bank*, 867 F.2d 1023, 1026 (7th Cir.1989).[19]

---

**14.** The merits of these claims are not pursued on appeal, except to the extent that their "frivolous" character is relevant to the imposition of sanctions under Rule 11.

**15.** In fact, the court noted that matters outside the scope of the pleadings—including the EEOC charge and Mrs. Rush's supplemental EEOC affidavit—had been used in support and in opposition to this motion. Therefore, the court, applying Fed.R.Civ.P. 12(b), properly treated this motion as a motion for partial summary judgment.

**16.** *See supra* n. 12.

**17.** The court declined to impose sanctions under Fed.R.Civ.P. 16(f). The defendants do not pursue this matter on appeal.

**18.** Although initially some of the plaintiff's claims were dismissed, the court treated its action on those claims as the grant of a motion for partial summary judgment. *See supra* n. 15.

**19.** *See Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 922 (7th Cir.1988) (identifying considerations in applying Rule 56 to Title VII claims); *Beard v. Whitley County REMC*, 840 F.2d 405, 409–10 (7th Cir.1988) (same).

On appeal, we "review the district court's entry of summary judgment *de novo*, drawing all reasonable inferences from the record in the light most favorable to the non-moving party," *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473 (7th Cir.1991), to determine whether the nonmoving party's offers of evidence did indeed raise these factual issues. *See Williams v. Anderson*, 959 F.2d 1411, 1413 (7th Cir.1992); *Ludwig v. C & A Wallcoverings, Inc.*, 960 F.2d 40, 42 (7th Cir.1992).

### B. *Title VII Claim*

#### 1. Prerequisites

There are a number of prerequisites to the successful maintenance of a claim under Title VII. *See* 42 U.S.C. § 2000e–5. First, the party must file a charge with the EEOC within the period of time allotted by the statute. Second, the Commission must issue a right to sue letter. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); *Movement for Opportunity and Equality v. General Motors Corp.*, 622 F.2d 1235, 1240 (7th Cir.1980). Here, there is no question that these steps were followed.

■ In addition, however, the scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC. An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination. This limitation is consistent with the principle of primary jurisdiction in the agency, for it gives the employer some warning of the conduct about which the employee is aggrieved, and it affords the

agency and the employer an opportunity to attempt conciliation without resort to the courts. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir.1985).[20]

In many cases challenging the allegations in the complaint for failure to come within the charge filed with the EEOC, the question of congruence arises because the charge was fairly detailed and the subsequent complaint deviated from the specific instances of discrimination.[21] Here, however, Mrs. Rush's charge was rather brief and very general.[22] She made specific reference to her termination, and then in the next sentence complained generally of racial discrimination. We must therefore decide whether such an open-ended charge can support any claims that may fall within its range. We conclude that the goals behind the requirement of prior resort to administrative relief would be frustrated if the filing of a general charge with the EEOC would open up the possibility of judicial challenges to any related conduct that took place in connection with the employment relationship.

Here, as previously noted, Count I of Mrs. Rush's complaint asserted five forms of race-based discrimination, including not only her termination, but also the failure to promote her from part-time to full-time status, the resulting denial of benefits, and racial harassment. As noted, in the actual typewritten charge she filed with the EEOC, she only made reference to her termination and to her belief that she had been discriminated against because of her race. However, on the same day, Mrs. Rush also submitted a three page, handwritten "EEOC Affidavit." In that document, there was an explicit reference to McDonald's' allegedly discriminatory pro-

---

**20.** "[T]he requirement that the scope of the EEOC charge limit the scope of the subsequent complaint is in the nature of a condition precedent with which litigants must comply rather than constituting a component of subject matter jurisdiction." *Babrocky*, 773 F.2d at 864.

**21.** *See, e.g., Allen v. Denver Pub. School Bd.*, 928 F.2d 978, 984 (10th Cir.1991) (charge filed with EEOC of discrimination regarding 1986 disciplinary action and 1988 termination did not per-

mit challenge to 1979 nonpromotion); *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1476 (9th Cir.1989) (charges filed of sexual harassment and denial of relocation and training did not support claims of denial of medical leave and benefits); and cases discussed *infra* n. 25.

**22.** *See supra* n. 9.

motion policies.[23]

This court considered the necessary relationship between the EEOC charge and the judicial complaint at some length in *Babrocky*. There, the plaintiffs had complained to the EEOC that their employer maintained sex-segregated job classifications, and that their union had agreed to this arrangement. In the subsequent lawsuit, they also complained about discriminatory hiring, recruiting, transfer and promotion policies. Upholding the plaintiffs' right to pursue these latter charges as well, this court determined that these policies were "closely linked" to the challenged job classifications, and that the latter could not be maintained absent the discriminatory policies. We stated that "[a]ll claims of discrimination are cognizable that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'[24] ... The standard is a liberal one in order to effectuate the remedial purposes of Title VII...." *Id.* at 864.[25]

Relying on *Babrocky* and on *EEOC v. World's Finest Chocolate, Inc.*, 701 F.Supp. 637, 640 (N.D.Ill.1988)—in which the court looked to the factual narrative of the charge to find that a claim of sex discrimination was raised, although only race discrimination had been checked on the EEOC form—the district court decided to apply a standard of "utmost liberality" to Mrs. Rush's claims. Using this test, it concluded that the plaintiff's first two claims—for racial discharge and denial of

promotion—were preserved; however, it held that the other three were not properly asserted. We agree that a lenient standard is appropriate and that, applying that standard, these first two claims were appropriately included in the complaint. We also conclude that the two claims which were derivative of the denial of promotion—denial of benefits and McDonald's' allegedly discriminatory promotion policy—were properly preserved as well. The plaintiff's theory regarding benefits is that she could have obtained these additional benefits only by being a full-time employee, and that the racial discrimination resulted not only in her lower employment status, but also in the accompanying denial of benefits.

■ However, we agree with the district court that the racial harassment claims were never properly presented to the EEOC, and therefore were not preserved. In reaching that conclusion, we are mindful of the admonition that "technicalities are particularly inappropriate in a statutory scheme [like Title VII] in which laymen, unassisted by trained lawyers, initiate the process." *Love v. Pullman Co.*, 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). However, the requirement of some specificity in a charge is not a "mere technicality." Some detail, beyond a statement that "I believe I have been discriminated against because of my race, Black" is necessary to allow the agency to perform its statutory duty. To the extent that Mrs.

---

23. "I would like to state that Sonia Roach (W) was hired in April 1986 as a part time word processor and in 2 months she became a full time employee. I believe that McDonald's has continuously allowed white employees to advance in the company. Blacks have not been allowed to advance as quick."

24. Quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.) (en banc) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir.1971)), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976).

25. *See also Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir.1989) (claim of racial harassment not preserved, when EEOC charge pertained to an earlier time period, only asserted discriminatory failure to promote, and referred to different employees); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544–45 (7th Cir.1988) (charge of retaliatory discharge did not fall

within scope of charge filed with EEOC of age discrimination), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989); *Box v. A & P Tea Co.*, 772 F.2d 1372 (7th Cir.1985) (handwritten addendum to typed charge of race discrimination, also suggesting sex discrimination, was sufficient to permit judicial claim), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); *Caldwell v. National Ass'n of Home Builders*, 771 F.2d 1051, 1054–55 (7th Cir.1985) (charge filed with EEOC of violation of ADEA for discriminatory discharge also contained claim for discriminatory failure to rehire); *Jenkins*, 538 F.2d at 167 (charge specifying racial discrimination and asserting that plaintiff was fired because of her Afro hairstyle, but which also referred to her role as leader of women employees, interpreted as also encompassing claims of sex discrimination).

Rush was specific regarding McDonald's' racial discrimination in the charge she filed, it was by referring only to her termination. Any doubt we might have that racial harassment was never brought to the attention of the EEOC is resolved in this case by noting that here, Mrs. Rush apparently was advised by her attorney even at the stage of filing her charge with the EEOC.[26] Therefore, it is not unreasonable to require some additional specificity or detail as a condition precedent for permitting her to assert her claim of racial harassment.

Mrs. Rush correctly asserts that the appropriate standard for measuring exhaustion is not those charges that the EEOC in fact considered, but those that were brought to its attention.[27] She argues that otherwise an administrative oversight, or even worse, a lack of interest or diligence on the part of the agency, would doom an employee's claim. While we do not dispute this premise, it is inapplicable here, where the agency's alleged failure to consider these claims was not the product of administrative inaction, but rather is the result of Mrs. Rush's own failure to bring all of these claims to its attention. We hold that it will not suffice to file general charges with the EEOC, as was done here, and then to expect that this allegation will permit all claims of race-based discrimination in a subsequent lawsuit. Therefore, we conclude that the claim under Title VII, premised on alleged racial harassment, was properly dismissed.

2. Discrimination in termination

a. basic requirements

■ Racial "discrimination" with respect to discharge, as that term indicates, requires more than evidence that the plaintiff's employment was terminated. Proof of "disparate treatment" is required. The plaintiff must show that the basis for the termination was the impermissible consideration of race, i.e., that a person of another race would not also have been discharged under similar circumstances. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 281–84, 96 S.Ct. 2574, 2579–81, 49 L.Ed.2d 493 (1976) (employer could legitimately dismiss employee for participating in theft of cargo; Title VII violation would occur, however, if employer dismissed white employees for same conduct for which black employees were not dismissed). This means that here, Mrs. Rush must show that a white person with a work record similar to hers, who also was absent from work under these circumstances, and whose failure to call in or give an explanation for her absence violated the employer's attendance policy, would nonetheless not have been terminated.

We considered similar facts in *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). A black employee was fired after he failed to report for work for five consecutive days; his employer believed that he was absent because of unauthorized personal reasons. Although Pollard claimed he had suffered an ankle injury, he had no documentation from a physician. He brought an action under Title VII and section 1981, asserting that his employer used his failure to report to work as a mere pretext for his discharge. This court held that, even if Pollard indeed was physically injured, and even if the employer was mistaken about the reasons for his absence, this erroneous basis for discharging him was nonetheless not a "pretext for discrimination," and thus was not actionable under the civil rights laws, unless there was evidence of *discrimination.*[28] The discharge of an individual,

**26.** Plaintiff's counsel's name, address and telephone number were given by Mrs. Rush on the EEOC Affidavit as a contact person.

**27.** *Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir.1990); *Albano v. Schering–Plough Corp.,* 912 F.2d 384, 387–88 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991); *Young v. City of Houston,* 906 F.2d 177, 179 (5th Cir.1990). *See also Stearns v. Consol-*

*idated Management, Inc.,* 747 F.2d 1105, 1110–13 (7th Cir.1984); *Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 967 (2d Cir.1984).

**28.** "[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Conti-*

regardless of his race, is not violative of these federal statutes unless race was the basis for the decision to terminate the employment relationship.[29] "Unless Pollard's race mattered—unless he would have been kept on if he were white—he is not entitled to relief.... The employee must show that race is the dispositive factor." *Id.* at 560–61.[30]

Racial discrimination in an employment setting can be proven either through direct or indirect evidence. Because of the substantial difficulty of obtaining "direct evidence" of discrimination, plaintiffs in the vast majority of cases resort to the "indirect" method;[31] Mrs. Rush apparently has chosen to pursue that route here.[32] The requirements for this approach, which is sometimes referred to as the "burden shifting" method,[33] are broadly set forth in two Supreme Court decisions: *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine,* the Court clarified

> the basic allocation of burdens and order of presentation of proof in a Title VII action alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. at 252–53, 101 S.Ct. at 1093 (footnote omitted). We shall consider these three steps in turn.

b. prima facie case

In *Burdine,* the Supreme Court stated that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Id.* at 253, 101 S.Ct. at 1093. In *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508 (7th Cir.1986), this court identified the elements required of a plaintiff seeking to make this showing:[34]

> A plaintiff may establish a prima facie case of intentional discrimination by offering evidence adequate to raise an inference that he was discharged on the basis of his race.... A plaintiff may accomplish this by showing that (1) he belongs to a racial minority, (2) he was

*nental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992).

**29.** In a Title VII disparate treatment action, "[u]ltimately, the plaintiff's evidence must show that she would not have been fired 'but for' her race." *Billups v. Methodist Hosp.,* 922 F.2d 1300, 1303 (7th Cir.1991). *See Kier v. Commercial Union Ins. Cos.,* 808 F.2d 1254, 1259 (7th Cir.) ("An employer can fire an employee for any reason, fair or unfair, so long as the decision to terminate is not based on age or some other protected category") (footnote omitted), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987).

**30.** "The employee thus bears the burden not only of persuading the trier of fact that the employer dissembled, but also that the employer's pretextual reason hides an unlawful one." *Reeder–Baker v. Lincoln Nat'l Corp.,* 834 F.2d 1373, 1377 (7th Cir.1987).

**31.** *See id.; see also* Arthur Larson & Lex Larson, 3 *Employment Discrimination* § 86.30 at 17–46 to 17–47 (1992) ("Sometimes the racial compo-

nent in a discharge is directly visible, although this occurs mostly in older cases.... More recent cases relying on direct evidence of racial bias are not common, but they do occur."). *But see McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir.1991) (relying on direct evidence approach).

**32.** Appellant's Br. at 25–27.

**33.** "Where a plaintiff can offer no direct, 'smoking gun' evidence of age discrimination, the burden shifting method affords an alternate route to relief." *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 (7th Cir. 1992).

**34.** *Yarbrough* was a § 1981 case. We noted that "[t]he same standards governing liability under Title VII apply to § 1981 claims." 789 F.2d at 511. *Accord Reeder–Baker v. Lincoln Nat'l Corp.,* 834 F.2d 1373, 1376 (7th Cir.1987).

doing his job well enough to meet his employer's legitimate expectations, (3) in spite of his performance he was discharged, and (4) the employer sought a replacement for him.

*Id.* at 511 (footnote omitted).

Here, there is no dispute that elements (1) and (4) are met. Although McDonald's points out that it hired another black person to replace Mrs. Rush, this fact is relevant to the latter stages of the *McDonnell Douglas–Burdine* inquiry (legitimate reason for discharge and pretext), rather than to the plaintiff's prima facie case.

Elements (2) and (3) of this first step are strongly disputed between the parties, however. Mrs. Rush points to several positive work performance reviews she received during her two years of employment to show that she was doing her job well.[35] McDonald's, on the other hand, points not only to her unexcused (and, to it, unexcusable) three day absence, but also to two prior disciplinary actions,[36] to indicate that Mrs. Rush's job performance was unacceptable. Thus, while Mrs. Rush can assert that she was discharged "in spite of" her good performance, McDonald's contends that it was her marginal performance during her employment tenure, and the violation of McDonald's attendance policy in connection with her absence immediately before her discharge, which became the cause for her termination.

Since this case comes here for review of a grant of a motion for summary judgment, this court cannot resolve this factual dispute.[37] Rather, we must accept legitimate factual conclusions in favor of the nonmoving party, here, Mrs. Rush. Therefore, we conclude that the plaintiff at least made out a prima facie case of racial discrimination.[38]

c. non-discriminatory reason for discharge

 Once Mrs. Rush made out her prima facie case, the burden shifted to the defendants to come forward with "some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. We agree with the district court that an employer would be justified in terminating an employee who was absent from work for three days, and who did not give an explanation of the reasons for her absence until she returned.[39] It almost goes without

---

**35.** In response, McDonald's asserts that even if Mrs. Rush received satisfactory ratings in the past, the relevant time to measure the quality of her work is the period surrounding her discharge. McDonald's relies on *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir.1991) (under ADEA) for the proposition that "whether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time."

However, we have held that, at this first stage of the analysis, a "determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work." *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 n. 6 (7th Cir.1988). Furthermore, even accepting defendants' reading of *Karazanos*, we could not resolve this kind of factual dispute in reviewing the grant of a motion for summary judgment.

**36.** *See supra* n. 5.

**37.** The prior disciplinary proceedings are at least suspect in denigrating Mrs. Rush's work performance. Not only did they antedate her discharge by a substantial period of time, but they also preceded her promotion from part-time to full-time status.

**38.** We do not intend to suggest that an employee whose work performance was merely marginal would nonetheless automatically satisfy these elements of the prima facie standard. The disputed quality of the employee's performance would raise questions of fact, if there were enough evidence to allow the action to proceed to trial. Furthermore, we recognize that the quality of an employee's work might also be considered at the second step of the *McDonnell Douglas–Burdine* test, since the employee's performance is relevant to the employer's decision to terminate him or her. The same conduct, which might merely result in a warning for an employee whose work was satisfactory, might be the final straw, resulting in discharge, for the marginal employee. *See Yarbrough*, 789 F.2d at 512.

**39.** Mrs. Rush asserts that her absence was not the real reason for her discharge. We discuss the issue of "pretext" in the next section. In addition, it is important to note the degree of

saying that an employer has a legitimate interest in insuring that each employee's work continues at a steady pace to meet the employer's production needs. Reliability and promptness are important considerations in maintaining a work force.[40] It seems self-evident that an employer is acting with a "legitimate, nondiscriminatory reason" in terminating an employee who simply fails to report to work and does not adequately explain his absence.[41] Thus, we conclude that McDonald's made the requisite showing to satisfy its burden under this portion of the *McDonnell Douglas–Burdine* test.

#### d. were reasons pretextual?

If the defendant meets its burden of production, the presumption raised by the plaintiff's prima facie case is rebutted. Since the plaintiff has the ultimate burden of persuasion,[42] she now must

> demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

It is on this requirement that the plaintiff's charge of racial discrimination fails. As noted above, the plaintiff relied principally on the "indirect" route of proof,[43] which, as the above-quoted passage indicates, requires evidence that McDonald's' "proffered explanation is unworthy of credence." To accomplish this, Mrs. Rush offered various pieces of evidence to show that the two individual defendants were biased against blacks, and that they were looking for an excuse to discharge her. She also asserted that the atmosphere in the McDonald's regional office was characterized by racial hostility, and that she was the subject of racial harassment.

We explained above why Mrs. Rush's failure to bring charges of racial harassment before the EEOC precludes her assertion of such a claim here. However, evidence of racial hostility, if demonstrated, might still be relevant to show that the reasons given for the plaintiff's discharge were merely pretextual. Mrs. Rush identified alleged instances of such hostility both during her work tenure and at the time of her discharge. Mrs. Rush asserts that both of the individual defendants were racist, and that their racial attitudes were manifested in a number of ways. While she points to several conversations in which Mr. Rose allegedly admitted to his own prejudice, the majority of Mrs. Rush's complaints are directed at her immediate supervisor, Ms. Funston. Some examples will illustrate the kind of evidence upon which Mrs. Rush would have relied at trial.

Mrs. Rush asserted that Ms. Funston made statements which reflected antipathy towards blacks, that Ms. Funston stated that blacks complained too much, and that she set up lunch schedules for office personnel to prevent black employees from eating together. Mrs. Rush also asserted that Ms. Funston would break up conversa-

---

the showing of "legitimate reason" required by *Burdine.* "The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." 450 U.S. at 254–55, 101 S.Ct. at 1094.

**40.** *See Kizer v. Children's Learning Center,* 962 F.2d 608 (7th Cir.1992) (black worker failed to follow employer's call-in procedure, which required employees to report if they were going to be late for work; discharge of employee who called in 45 minutes after required call-in time was justified and not pretextual).

**41.** *See Rodriguez–Morales v. Veterans Admin.,* 931 F.2d 980 (1st Cir.1991) (upholding discharge of absent worker); *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987) (same); *Thompson v. Rockwell Int'l Corp.,* 811 F.2d 1345 (10th Cir.1987) (same).

**42.** "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

**43.** *See supra* n. 32 and accompanying text.

tions among the black employees. Mrs. Rush stated that Ms. Funston had a code phrase for her belief that conversations among blacks were always characterized by complaints—"Perception is reality"—and that Ms. Funston used this expression as often as twice a week after observing such conversations. Mrs. Rush asserts that the frequent repetition of this phrase evidences Ms. Funston's hostile and prejudicial attitude towards blacks.

Mrs. Rush also pointed to an incident regarding the company car. The car was rotated among departmental employees. On one occasion, Ms. Funston arranged for the car to be given, out of sequence, to a white employee whose car had been repossessed. However, Mrs. Rush avers that when, on another occasion, it was her turn for the car, and she used it to pick up Elaine Bell, another black employee whose car was not working, Ms. Funston instructed Mrs. Rush not to take Ms. Bell to work any more.

The Supreme Court considered the evidentiary value of stereotyped remarks in the workplace in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Both the plurality opinion and Justice O'Connor's concurring opinion stressed that stray remarks did not prove that inappropriate criteria had been used in making an employment decision, and that a plaintiff still had to show that these criteria were the basis for the employer's decision:

Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision.

*Id.* at 251, 109 S.Ct. at 1791. We applied this standard in a discharge case in *McCarthy v. Kemper Life Insurance Companies*, 924 F.2d 683 (7th Cir.1991). We concluded that, in order to suffice as evidence of racial animus in support of a claim of disparate treatment, the racial remarks must be relatively contemporaneous to the termination of employment and must be "related to the employment decision in question." *Id.* at 686–87. We found that racial remarks made two years before the plaintiff's discharge, and made either by persons who were not decisionmakers or, if made by the plaintiff's supervisors, uttered in unrelated contexts, were not probative of discrimination.[44] Similarly, in *Beard v. Whitley County REMC*, 840 F.2d 405 (7th Cir.1988), we concluded that, on that record, various statements allegedly evidencing antifemale animus raised only the "metaphysical doubt" which the Supreme Court in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986), found insufficient to create a genuine issue of material fact.[45] We concluded that "[i]nappropriate remarks, standing alone, need not raise an inference of discriminatory intent." *Beard*, 840 F.2d at 410.[46]

---

**44.** [S]tray remarks in the workplace, while perhaps probative of sexual harassment, ... cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.
*Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring). *See also Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989) (requiring "nexus between the statements made by the defendant and the demotion of the plaintiff to demonstrate that plaintiff's race was a 'substantial factor' in the defendant's decision").

**45.** "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted). *See also Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992); *Baker v. Elmwood Distrib., Inc.*, 940 F.2d 1013, 1016–17 (7th Cir.1991).

**46.** *See Clark v. Atchison, Topeka & Santa Fe Ry. Co.*, 731 F.2d 698, 702 (10th Cir.1984) (employer's discriminatory intent not inferred from remarks made to employee by employee's supervisor because there was no "particularly egregious treatment"). *Cf. Kizer v. Children's Learning Center*, 962 F.2d 608 (7th Cir.1992) (defendant-employer's allowing extended display of plaintiff's photograph, which had been defaced, was not probative of racial motivation for plaintiff's discharge).

Here, we must conclude that, on this record, Mrs. Rush's allegations concerning Ms. Funston's conduct are insufficient to meet plaintiff's burden of showing that the reason given by McDonald's for Mrs. Rush's discharge was pretextual. Mrs. Rush has not shown that the animus reflected in the defendants' alleged conduct on other occasions was the cause of the decision to discharge her, rather than a serious violation of McDonald's' attendance policy.

■ We next turn to two incidents which surrounded Mrs. Rush's discharge, which she also offered as evidence of the defendants' racial prejudice. On Tuesday, May 3, the second day of Mrs. Rush's absence, Ms. Funston wanted to send her a letter asking for an immediate explanation and information about her eventual return. Because she thought she did not have Mrs. Rush's current address, Ms. Funston drove with Elaine Bell to the house in which Ms. Bell thought the plaintiff lived. However, Ms. Funston did not hand-deliver the letter, but instead returned to the office and arranged for delivery by courier.[47] Mrs. Rush suggests that this scenario demonstrates hostility to blacks; she also suggests that this indicates that her absence from work was not creating critical problems in the office. Why, she asks, did Ms. Funston not simply knock on the door and give Mrs. Rush the letter, and also ask about the work situation. However, Ms. Funston's conduct is at least as explicable on completely race-neutral grounds. It is quite understandable that a supervisor might not want to confront an employee at her home, and instead would want to discuss her absence—and any disciplinary response thereto—only at the office.

■ As to the second example, Mrs. Rush asserts that when she finally reported to work on Thursday morning, she met with Ms. Funston and with the office personnel manager, Sharon Wilson. Rather than firing Mrs. Rush on the spot, they first asked for reasons for her absence, and then gave her a notice of discharge only a few minutes later. Mrs. Rush concludes from this that Ms. Funston and Mr. Rose had, at some earlier point, decided to fire her as soon as the opportunity presented itself, had already made up their minds on Wednesday to discharge her regardless of the reasons for her absence, and used her three-day absence as a pretext.[48] However, it seems at least as plausible that the procedure that they followed—including the delay of a few minutes to produce the typewritten notice—was designed to allow Mrs. Rush the opportunity to offer a satisfactory explanation for her absence, and that they proceeded with her termination only when that reason was not forthcoming.[49]

We reiterate that once the defendant-employer offers a legitimate, nondiscriminatory reason for the discharge, the burden of persuasion lies on the plaintiff to show that this was not the true reason. At that point, the employee must demonstrate "by a preponderance of the evidence that she would not have been fired 'but for' her race." *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir.1991). *Accord Heerdink v. Amoco Oil Co.*, 919 F.2d 1256, 1261–62 (7th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2826, 115 L.Ed.2d 996

---

**47.** It turned out that Ms. Bell went to the wrong house, and so the letter apparently never was delivered to Mrs. Rush.

**48.** Mrs. Rush apparently asserts that they either should have fired her on the spot, without even asking for an explanation, or that they should have waited a longer period of time to decide whether to discharge her. In her view, the short time period was evidence of pretext. *See Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir.1991) (discharge was not pretextual, since employee's conduct justified immediate termination rather than suspension and investigation; "[i]t is not this court's practice to ques-

tion an employer's good faith business decision").

**49.** We are sympathetic to the medical problem which Mrs. Rush suffered, and do not mean to make light of the embarrassment that she experienced. However, it does not follow that Title VII prevents an employer from discharging an employee under the circumstances we have described. Title VII is violated only if there is a showing that the employer would have treated an employee of a different race any differently, who also suffered that condition and who responded to it as Mrs. Rush did.

(1991). We agree with the district court's conclusion that, taking all the evidence proffered by Mrs. Rush in the light most favorable to her, no reasonable trier of fact could have found that McDonald's' reason for discharging her was merely pretextual and "unworthy of credence." [50] Therefore, we conclude that summary judgment was properly granted on her Title VII claim of racially motivated termination.

### 3. Discrimination in promotion

■ Mrs. Rush complains that McDonald's discriminated against her on the basis of race by its initial decision to hire her only in a part-time status, and, by its subsequent refusal, from November 1985 through December 1987, to promote her to full-time status, even though she allegedly was working the number of hours and doing the amount and quality of work of a full-timer. McDonald's responds that it made a decision, for legitimate business reasons (rather than any racially motivated factors), to staff the word processor positions with part-timers, and that there simply was no full-time position available into which Mrs. Rush could have been hired or, until January 1988, subsequently promoted. We agree with the defendants that, unless Mrs. Rush could show that the refusal to create a full-time position was based on a desire not to hire or promote minorities, the absence of an available position is fatal to her claim. The bare fact that Mrs. Rush may have been working as many hours, or doing the same work, as a full-time person, does not make out her claim of racial discrimination.

Initially, we note that one of the four elements of the *McDonnell Douglas* test for establishing a prima facie case of racial discrimination in hiring is the presence of a position. The Supreme Court stated that the plaintiff's initial burden may be satis-fied "by showing ... that he applied and was qualified *for a job for which the employer was seeking applicants....*" *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (emphasis added).[51] On the one hand, if an employer is willing to consider white persons for an open position, but would refuse to consider applications from minorities for that position, it appears logical to characterize that conduct as racial discrimination. On the other hand, it would appear not to be discriminatory if the employer is not hiring anybody, for example, if there is no vacancy to be filled, and that would normally be the end of a Title VII claim.

Although the plaintiff cites no authority for the proposition, we recognize the possibility that an employer may decline to hire anybody into a particular position (here, full-time employees), because of a discriminatory animus, and may seek to have the work performed in other ways to accomplish this goal. That is the implication of the last portion of the plaintiff's Count I— McDonald's' alleged policy of filling the word processor position with minorities, who would be hired on a part-time basis only.

Assuming that evidence of this policy would be another way to make out plaintiff's prima facie case, the burden would then shift to the defendant to offer a legitimate, nondiscriminatory reason for the decision. McDonald's did this by suggesting that, in the 1985–87 time period, it was moving its regional office, expanding the equipment in the word processing area and implementing a new computer system. It also added that, although Mrs. Rush made numerous requests to Mr. Rose to be promoted to a full-time position, he did not have the authority to create such a position

---

**50.** As noted above, McDonald's replaced Mrs. Rush with another black employee. This fact does not automatically refute Mrs. Rush's claim that she was discharged because of impermissible racial considerations. However, it does suggest that her unexcused and unexplained absence was not merely a ruse for discharging a black worker, but rather the real reason for terminating her employment.

**51.** *Accord Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 ("The plaintiff must prove by a preponderance of the evidence that *she applied for an available position* for which she was qualified....") (emphasis added).

and needed authorization from his own supervisor.[52]

Under *McDonnell Douglas–Burdine*, this showing shifts the burden to the plaintiff, to offer evidence that these reasons were pretextual. And, it is again at that stage that Mrs. Rush's claim founders. Although she pointed to the racial background of the various persons employed in the Indianapolis regional office during the 1980's, she simply offered no evidence which would have supported her assertion either that McDonald's had a policy of the kind she suggests,[53] or that the decision to use only part-time word processors in Indianapolis from 1985 to 1987 was motivated by anything other than strictly legitimate business considerations. We therefore conclude that the trial court properly granted summary judgment with regard to Mrs. Rush's claim of discriminatory refusal to promote her to full-time status.

## C. *Section 1981*

■ Mrs. Rush's claim under Count II, arising under 42 U.S.C. § 1981, asserted that the refusal to promote her from a part-time to a full-time position was the product of racial considerations. This count must fail on two grounds—one factual, the other legal. First, as just discussed, the record before us establishes that McDonald's' decision not to promote her to a full-time position until January, 1988, was not based on racial factors, but rather was the product of independent and lawful business considerations. Just as this conclusion dooms her claim under Title VII, so also is it fatal to her section 1981 claim. Since section 1981 affords to "[a]ll persons

... the same right ... to make and enforce contracts ... as is enjoyed by white citizens," [54] some showing of differential treatment on the basis of race is a necessary element of a claim under that statute. *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 575 (2d Cir.1989); *Long v. Ford Motor Co.*, 496 F.2d 500, 504 (6th Cir.1974).

■ Second, we conclude that, even if the facts supported her claim, section 1981 does not apply to discriminatory refusals to promote during the time period in question. In *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that, in the employment context, section 1981's proscription of racial discrimination in the making of a contract applied only to refusals to hire and to promotions that "rise[ ] to the level of an opportunity for a new and distinct relation between the employee and the employer...." *Id.* at 185, 109 S.Ct. at 2377. This court held in *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991), that most transfers or promotions "are part of the ordinary progression of a business executive with his company and it would be very odd to regard each rung on the career ladder as a different employment relation," *id.* at 110; therefore, most refusals to promote were not encompassed by section 1981.[55] Similar considerations apply here. Indeed, one of Mrs. Rush's grievances is that she was doing the work of a full-time employee, even while on part-time status. It would be anomalous to find that the

---

**52.** In addition, it is probable that McDonald's realized a savings in its payroll expenses by using several lower paid, part-time employees rather than one full-time person. While those part-time employees may feel that they were being "exploited," there is nothing to suggest that this is not also a lawful and rational way of doing business. And, of paramount importance, this motivation has nothing to do with racial discrimination; there is no indication in the record that white part-time employees were, or would have been, treated any differently.

**53.** In fact, Mrs. Rush apparently does not pursue the aspect of her claim which refers to this

alleged policy on appeal. She omits this claim from the portion of her brief dealing with Title VII, and she only alludes to it in the portion dealing with sanctions, admitting that "the evidence [of this claim] is not conclusive." Appellant's Br. at 46.

**54.** 42 U.S.C. § 1981.

**55.** *See also Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1311 (7th Cir.1989). *Cf. Bailey v. Northern Ind. Pub. Serv. Co.*, 910 F.2d 406, 410 (7th Cir. 1990) (claim of discriminatory refusal to promote apprentice electrician to management position might survive *Patterson* ).

promotion she received, in part in recognition of her actual duties, was the creation of a "new employment relationship."

Since then, Congress has overturned this interpretation of *Patterson,* by section 101 of the Civil Rights Act of 1991,[56] and we have been required to decide whether that statute should have retroactive application to refusals to promote occurring prior to its passage. In *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (7th Cir.1992), we joined several other courts of appeals in denying retroactivity to that portion of the Act. Specifically, we "determined that the *Bowen [v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)] presumption of prospective application will apply to substantive provisions" of the Civil Rights Act of 1991. *Mozee,* at 936–37. Therefore, since the conduct complained of by the plaintiff occurred between 1985 and 1987, it follows that her action under section 1981 is barred by *Patterson.* The district court properly granted summary judgment for defendants on Mrs. Rush's claim under section 1981.

## D. ERISA

■■■ Count III of Mrs. Rush's second amended complaint asserted a claim under section 510 of ERISA. Her theory was that she was denied benefits which are protected by that statute, because she was only classified as a part-time employee. That section provides in relevant part that "[i]t shall be unlawful for any person to ... *discriminate* against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant *may become entitled under the plan....*"[57]

The difficulty with Mrs. Rush's claim is that, by its terms, section 510 is applicable only when there is discrimination against a participant in a plan with respect to benefits to which a participant is entitled. Here, McDonald's afforded one set of benefits to all persons classified as full-time employees, and there is no allegation that any of those employees did not receive those benefits. McDonald's made available another series of benefits—admittedly fewer and less generous—to part-time employees.[58] Again, there is no allegation that any part-time employees—including Mrs. Rush—did not receive those benefits. However, Mrs. Rush argues that ERISA requires that she had to be treated as a full-time employee for purposes of calculating benefits, since she in fact did the work of a full-timer.[59]

There is simply no authority for this proposition.[60] The language of the statute

---

**56.** Pub.L. No. 102–166. Section 1981 was amended to provide that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

**57.** 29 U.S.C. § 1140 (emphasis added).

**58.** In fact, ERISA does not require an employer to give any benefits at all to its employees. It instead provides that, once the decision is made to afford benefits, like situated employees must be treated in similar fashion.

**59.** Although her contentions are not clear, Mrs. Rush also appears to argue that McDonald's was required to afford identical benefits to both groups of its employees, and that the less generous benefits for part-time employees also were "discriminatory."

**60.** The only case cited by the plaintiff in support of her position, *Ahne v. Allis Chalmers Corp.,* 640 F.Supp. 912 (E.D.Wis.1986), is simply not

on point. There, the employer first froze the salaries of a group of its employees, then "temporarily reduced" those salaries, and finally terminated their employment while the salary reductions were in place. The employees were covered by a welfare benefit plan; the level of their benefits, which included termination pay, was calculated based on those reduced salaries. The evidence indicated that the employer took these steps with a view towards reducing its salary costs.

While dismissing the plaintiffs-employees' claim under ERISA § 502, the district court held that these facts stated a claim under § 510, because the employer's acts diminished the plaintiffs' participation in an ERISA-protected benefit plan; this conduct constituted discrimination against them for the purpose of interfering with the attainment of their rights as plan participants. The court rejected the defendant's contention that there was no discrimination because the salaries of *all* salaried personnel were reduced. *Id.* at 920.

Without passing on the correctness of the district court's analysis, we find its reasoning

does not require it, and there is no case law to support it. To the contrary, "a § 510 plaintiff must prove *specific intent* by [the employer] to interfere with his pension rights." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991) (emphasis added). Furthermore, "a fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way." *Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir.1990).

The benefit plans that McDonald's created and offered to its employees were consistent with the requirements imposed by ERISA. Mrs. Rush did receive all the benefits which the plan made available to all part-time employees, and she was not treated any differently than any other part-time employee.[61] The district court properly granted McDonald's' motion for summary judgment regarding Mrs. Rush's ERISA claim.

### E. *Sanctions*

#### 1. Standard of review

■ Rule 11 requires every pleading of a party represented by an attorney to be signed by the attorney of record, and further provides that the attorney's signature

> constitutes a certificate by the signer that the signer has read the pleading, ... that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose....[62]

Finally, "if a pleading ... is signed in violation of this rule, the court ... shall impose upon the person who signed it ... an appropriate sanction."[63]

In *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir.1989), we recognized that a trial court's decision whether to impose sanctions under Rule 11, and if so, what sanctions are appropriate, involves the resolution of a fact-intensive dispute. Therefore, we held that the standard for our review of an order imposing sanctions was one of deference, looking to whether the court abused its discretion.[64]

#### 2. Sanctionable conduct

The defendants made two separate motions for sanctions.[65] To support their request, they pointed to three particular instances of conduct which assertedly justified such an order: (1) Mrs. Rush's claims under Title VII exceeded the scope of the charge she filed with the EEOC; (2) when Mrs. Rush asserted her ERISA claim in her first amended complaint, she was still unaware whether an ERISA violation had oc-

inapplicable to the facts of this case. First, in *Ahne,* by virtue of their employment under their employer's plan, the plaintiffs had earned some benefits and were eligible for certain rights; on the other hand, Mrs. Rush never earned such benefits, and was not eligible for them because she did not fall within the group (full-time employees) covered by the particular plan. Second, here, McDonald's has not taken selective, affirmative steps to diminish Mrs. Rush's rights with respect to, or participation in, its benefit plan. There is no "discrimination," as that term is used in ERISA § 510, in having full-time and part-time employees, and having different benefit plans for these two groups.

**61.** *See Adams v. LTV Steel Mining Co.,* 936 F.2d 368, 370 (8th Cir.1991) (no § 510 violation by allowing salaried employees to retire early pursuant to benefit plan, but denying same right to hourly employees), *cert. denied,* —— U.S. ——, 112 S.Ct. 968, 117 L.Ed.2d 134 (1992).

**62.** Fed.R.Civ.P. 11.

**63.** *Id.*

**64.** We held that equal deference was owed to the question of whether sanctions were appropriate because the conduct was subjectively improper, i.e., the pleading or motion was "interposed for an improper purpose," or it was objectively improper, because the attorney failed to make "reasonable inquiry" beforehand. *Mars,* 880 F.2d at 931–32.

The Supreme Court subsequently approved this approach, holding that "an appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990).

**65.** *See supra* n. 12.

curred, and needed discovery to resolve that preliminary question; and (3) the state law claims in Counts IV and V were clearly barred by existing law.

In its order granting the defendants' motion for summary judgment, the district court imposed sanctions upon the plaintiff's attorney. It found that "[e]ach of these [three] assertions has merit." The district court's views with respect to the first two areas have been discussed in earlier parts of this opinion. With respect to the third claim, the court pointed out that an Indiana Court of Appeals case, *Fields v. Cummins Employees Federal Credit Union*, 540 N.E.2d 631 (Ind.Ct.App.1989), which was decided approximately six weeks before Mrs. Rush's complaint was filed,[66] constituted a direct bar to her claim for intentional infliction of emotional distress (Count V). The court also concluded that her wrongful discharge claim was barred by Indiana's employment-at-will doctrine (Count IV). Since these two counts were simply unavailable as a matter of law, the court concluded that they were frivolous and that the imposition of sanctions was required.[67]

In deciding what sanctions to apply, the court rejected the defendants' request for the attorney fees they were required to pay in resisting these three claims. Although the court recognized that the defendants might have incurred some additional legal fees in connection with these claims, the court rejected the defendants' characterization of them as "baseless," and decided that a less severe sanction was warranted. However, the court concluded that both monetary and nonmonetary sanctions were appropriate. Accordingly, the court determined to award costs against plaintiff's counsel and ordered a reprimand.

### 3. Propriety of order of sanctions

As noted, we apply a standard of deference to the district court's order, and shall set it aside only for abuse of discretion.

Here, we conclude that the district court acted well within its discretion in imposing the sanctions it did.

While we agree with the district court that at least one of the plaintiff's claims under Title VII—that for racial harassment—was outside the scope of the charges filed with the EEOC, it does not appear that the assertion of this claim was groundless or frivolous. Indeed, we have concluded that two of the theories asserted under Title VII—denial of benefits and the alleged discriminatory hiring policy—were derivative of the discrimination in promotion claim, and were properly subsumed in the allegations in plaintiff's affidavit.

 The ERISA claim was far more doubtful. While we are not troubled by an assertion that a plaintiff will need discovery to make out her case, here the defect was not factual, but legal. There is simply no case law to support the proposition that ERISA applies to the failure to give a part-time employee the same benefits as a full-time employee because she works more than the usual part-timer, and no amount of pretrial discovery was needed to unearth that fact. Rather, this is the kind of legal question which a practitioner should be expected to research before filing a complaint.

 With respect to the state law claims, Mrs. Rush's attorney offers a number of explanations for her assertion of these two counts in the face of apparently preclusive state law. She states that because she is a sole practitioner, she did not have the resources to learn immediately about the *Fields* decision. She also asserts that a bill was pending in the Indiana legislature which she believed would overturn *Fields* and restore Mrs. Rush's claim.

We are not insensitive to the realities of practice, and we recognize that persons practicing law by themselves or in small firms may not have instant access to the

---

**66.** *Fields* was decided on July 6, 1989. The original complaint was filed on August 18, 1989.

**67.** "An attorney takes a frivolous position if he fails to make a reasonable inquiry into facts (which later prove false) or takes a position

unwarranted by existing law or a good faith argument for its modification." *Magnus Electronics, Inc. v. Masco Corp.*, 871 F.2d 626, 629 (7th Cir.), *cert. denied*, 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989).

latest court decisions. Thus, while lamentable, it is perhaps understandable that plaintiff's counsel did not know of the *Fields* decision when she filed her original complaint, and a court might conclude that her failure to discover this decision did not bring her conduct outside the realm of a "reasonable inquiry."[68] However, her amended complaint was filed more than four months after the original complaint, and nearly six months after *Fields*, and it still contained the intentional infliction of emotional distress count. By this later date, one can no longer excuse her failure to recognize that *Fields* barred the claim.[69]

She also asserted that she learned of a bill, which was to be filed in the 1990 session of the Indiana General Assembly, that would have overturned *Fields;* she contends that she therefore maintained this claim in the complaint, in the hope that it would be resuscitated. If this belief was reasonable, this fact might bring her within the rubric of a "good faith argument for the ... reversal of existing law." It is difficult to determine how much weight one can put on the unsure prospects for passage of legislation, which might have justified the revival of Mrs. Rush's claim.[70] However, the Indiana legislature in fact adjourned for the year on March 13, 1990, and yet more than 2½ months passed before the plaintiff moved to dismiss Count V. In light of all these circumstances, we conclude that the trial court did not abuse its discretion in imposing sanctions against Mrs. Rush's attorney.

We note that, in their very first filing, a motion for a more definite statement, the defendants' supporting brief asserted that "because it is very likely that a number of claims purportedly raised are frivolous and without legal foundation in law or in fact, McDonald's believes that Rule 11 sanctions may be imposed." In their next filing—McDonald's reply brief in support of that motion—the specter of sanctions was repeated. "One would reasonably believe that on notice of these shallow waters, Plaintiff would welcome the opportunity to steer a course away from Rule 11 sanctions by amending her Complaint."

It is our view that sanctions, or even the threat of sanctions, should not be used as a means of bullying a weaker opponent. The district court judge should not tolerate turning the Rule 11 motion into a method of intimidation. On the other hand, it is quite appropriate for one party to warn the other party about the possibility of a request for sanctions under Rule 11, and we would not want to discourage that practice. Supervision of the proper use of Rule 11 is a matter for the district court. The trial court is in the best position to determine on which side of the line a party's conduct falls. Here, the district court did not view the defendants' conduct as threatening, and we cannot determine otherwise based only on the written record.

Finally, we have noted, earlier in this opinion, that the district court erred in holding that several of Mrs. Rush's allegations were beyond the scope of the initial EEOC charge. The inclusion of these allegations in the complaint cannot, therefore, be a basis for the imposition of sanctions. However, given the leniency demonstrated

---

**68.** As the district court noted, 760 F.Supp. at 1365 n. 21, Mrs. Rush's attorney surprisingly undermined her own position by pointing to her extensive experience, the number of services to which she subscribed, and so forth. This background undercuts the excuse she offered for her errors of omission and commission.

**69.** The district court was also understandably troubled by a subsequent misrepresentation regarding this chronology offered by plaintiff's counsel. On June 1, 1990, the plaintiff filed a Motion to Dismiss her Claim of Intentional Infliction of Emotional Distress. In explaining that motion, she stated that *"since the filing of*

*her claim ... a decision of the Indiana Court of Appeals held that an employee's exclusive remedy for such injuries against the employer is under the state's workers compensation laws."* (emphasis added). When the defendants pointed out this misstatement in connection with their request for Rule 11 sanctions, Mrs. Rush's attorney responded by affidavit that this was "an inadvertent statement." Plaintiff's Counsel's Aff. Aug. 20, 1990, at 4.

**70.** It is precisely this kind of fact-specific inquiry which *Mars* indicates is more appropriately within the province and ability of the district court.

by the district court, we are confident that a remand is not necessary.[71]

### Conclusion

For the reasons stated above, the judgment of the district court, and the order imposing sanctions pursuant to Rule 11 against plaintiff's attorney, are affirmed.

AFFIRMED.

---

**71.** *Cf. Gorenstein Enters., Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 437 (7th Cir.1989) (erroneous award of attorney's fees under federal trademark statute was harmless error, since imposition of those fees under Rule 11 was clearly appropriate).