Wilma TIBBITTS, Plaintiff,

v.

VAN DEN BERGH FOODS COMPANY, a division of Conopco, Inc., a New York corporation, Defendants.

No. 92 C 1559.

United States District Court, N.D. Illinois, Eastern Division.

July 15, 1994.

Roger J. McFadden, Thomas J. Dillon, Tyrrel J. Penn, McFadden & Dillon, Chicago, IL, for plaintiff.

Ralph Andrew Morris, Brittain, Sledz, Morris & Slovak, Chicago, IL, Robert J. Kartholl, Jr., Van Den Bergh Foods Co., Lisle, IL, for defendants.

**1170**

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

■ Plaintiff Wilma Tibbitts ("Tibbitts") sues defendant Van Den Bergh Foods Company ("Van Den Bergh") for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.*, alleging that Van Den Bergh willfully discriminated against her on the basis of age when it terminated her.[1] Van Den Bergh moves for summary judgment.

### BACKGROUND

■ The parties have submitted the following facts as to which there is no genuine issue. Tibbitts was an employee of Durkee Foods in the accounting department at the Joliet, Illinois plant—an edible oils manufacturing facility—from February 22, 1977, to December 5, 1988, at which time Van Den Bergh purchased certain of Durkee's assets including the Joliet plant. Defendant's Statement of Material Facts as to Which There is No Material Issue ("Defendant's Facts"), ¶¶ 6, 10–13 [2]. Plaintiff continued to work at the Joliet plant, now under Van Den Bergh's control, from December 5, 1988, until her termination on October 22, 1990. *Id.*, ¶ 7. At the time of her termination, Tibbitts held the position of Chief Accounting Clerk and was 60 years of age. *Id.*, ¶¶ 5, 8.

In early 1990, Van Den Bergh undertook a staffing evaluation at the Joliet facility. *Id.*, ¶ 15. Management determined that a reduction-in-force ("RIF") of ten employees should be implemented effective October, 1990. *Id.*, ¶¶ 16, 17.

R. Bishop, Director of Cost Accounting, directed Robert Dudzik ("Dudzik") to evaluate the accounting/finance department at the Joliet facility and make recommendations for the elimination of jobs within that department. *Id.*, ¶ 25. Dudzik was the Cost Controller of oils and was responsible for the financial reports for the margarine and oil business. He also assisted plant managers in the profitability of their own facilities. *Id.*, ¶ 18. From 1984 to 1989, Dudzik was the Plant Controller at the Joliet facility. *Id.*, ¶ 24.

Over the course of several weeks, in consultation with Bishop and R. Lundin (Joliet Plant Controller), Dudzik analyzed the duties of each accounting/finance position at the Joliet facility. *Id.*, at ¶ 27. Dudzik prepared a detailed written evaluation of the job tasks of each position, *id.*, ¶ 28, and submitted a written recommendation to Bishop recommending the elimination of the Senior Cost Accounting Clerk position (a position that was vacant as the result of a voluntary resignation). *Id.*, ¶¶ 30, 31. Dudzik also recommended that, if necessary, certain duties of the Chief Accounting Clerk could be eliminated and the remaining duties could be split up amongst the other members of the department thereby eliminating that position. *Id.*, ¶¶ 29–32. Bishop evaluated Dudzik's recommendations, concurred in them and passed them on to his supervisor D. Peffer who also concurred and passed them on to T. Stephens, Vice President, Finance and Administration. *Id.*, ¶¶ 33–34. Subsequently, Dudzik was informed that the positions of Senior Cost Accounting Clerk and Chief Accounting Clerk would be eliminated and he was instructed to terminate Tibbitts which he

---

1. Tibbitts' Complaint identified Van Den Bergh's failure to rehire her as a basis upon which she was alleging discrimination. Complaint ¶ 14(B). Based upon Tibbitts' failure to brief the rehiring claim as a separate and distinct claim and Van Den Bergh's representation to the court that Tibbitts' "counsel has stated in open court that this is [not] a failure to rehire case," Defendant's Memorandum at 9 n. 10, the court assumes that Tibbitts' has abandoned her failure to rehire claim as a separate ground for recovery.

2. In its Amended Local Rule 12(N)(1) Response to Defendant's Local Rule 12(M) Statement, Tibbitts responds to several of Defendant's fact paragraphs by stating, "Tibbitts has insufficient infor-

mation to form a belief as to the truth or falsity of the statements contained in paragraph [——]." This boilerplate language may be appropriate in answering a complaint, but it is not adequate as a response to a 12(M) statement of material facts as to which there is no genuine issue. Local Rule 12(N)(3)(b) provides, in pertinent part, "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless specifically controverted by the statement of the opposing party." Accordingly, the court will regard any statement in either party's Local Rule 12 statement of material facts to be uncontroverted unless specifically denied by the other party.

did on October 22, 1990. *Id.,* ¶¶ 35–37. During all relevant times, Dudzik was 37 years old. *Id.,* ¶ 18.

Van Den Bergh maintained a company-wide management policy in connection with any non-union RIF, that an individual whose position is eliminated be terminated. *Id.,* ¶ 38. A collective bargaining agreement covering union employees provided that more senior employees faced with layoff could displace (or "bump") less senior employees. *Id.,* ¶¶ 39, 41. Tibbitts was a nonunion employee. *Id.,* ¶ 40.

At the time of the RIF, Betty Damon was employed in the accounting department as the Accounts Payable Clerk. Ms. Damon, 60 years of age in October, 1990, did not lose her position as part of the RIF; however, she gave notice of her voluntary retirement on January 7, 1991, and retired effective January 18, 1991. *Id.,* ¶¶ 48–53. On January 18, 1991, Tibbitts left two copies of a letter with a Joliet plant security guard concerning her interest in filling the position vacated by Damon. *Id.,* ¶ 54. The security guard left one copy on the desk of Chris Cole, Human Resource Manager, and gave the second copy to V. Smoots, Human Resources Assistant (and Tibbitts' daughter), who placed the letter in the interoffice mail addressed to Dudzik. *Id.,* at ¶¶ 55–57. Tibbitts never received any response to her letters. *Id.,* ¶ 58. Damon's position was filled by a temporary employee, Mariann Buczyna (age 44), beginning January 14, 1991. Buczyna was made a permanent employee on March 11, 1991. *Id.,* ¶¶ 60–61. Van Den Bergh's personnel policy prohibits the rehire of any former employee without the express permission of the Senior Vice President of Human Resources. *Id.,* ¶ 59.

Van Den Bergh moves for summary judgment contending that there is no genuine issue of material fact as to whether age was a factor in Tibbitts' termination or as to whether Van Den Bergh's legitimate nondiscriminatory justification for terminating Tibbitts was a pretext.

## DISCUSSION
### Summary Judgment Standard

▉ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## I. *Establishing Age Discrimination*

▉ The plaintiff's burden in an age discrimination action is to prove that he or she was discharged (or otherwise adversely treated in employment) as a result of his or her age. Age need not be the only factor motivating the adverse action, but it must be a determining factor—a "but for" cause; that is, "but for" age discrimination, the plaintiff would not have been treated adversely. *Konowitz v. Schnadig Corp.,* 965 F.2d 230, 232 (7th Cir.1992); *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988); *Ayala v. Mayfair Molded Prods. Corp.,* 831 F.2d 1314, 1318

(7th Cir.1987). The plaintiff may attempt to prove discrimination directly by presenting direct or circumstantial evidence that age was the determining factor in the employment action; or, the plaintiff may employ the indirect (or "burden-shifting") method of proof originally set out for Title VII actions in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and subsequently adapted to ADEA claims in *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1212 (7th Cir.1985). *See Oxman*, 846 F.2d at 452; *Ayala*, 831 F.2d at 1318.

 Under the *McDonnell Douglas* burden shifting approach, the plaintiff may establish a *prima facie* case of discrimination by showing that she was: (1) a member of the protected class; (2) performing her job satisfactorily; (3) subjected to a materially adverse employment action despite her satisfactory performance; and, (4) treated less favorably than similarly situated employees outside of the protected class. *Konowitz*, 965 F.2d at 232. If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises and the burden of production shifts to the employer to articulate a legitimate nondiscriminatory justification for its action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Konowitz*, 965 F.2d at 232; *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir. 1984). If the employer meets its burden of production, the presumption is rebutted and the burden falls on the plaintiff to prove that the proffered reasons are a pretext—that is, not the true reason for the employment action. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *LaMontagne*, 750 F.2d at 1409. Pretext may be established by showing either that a discriminatory intent more likely motivated the employer or that the employer's proffered explanation is unworthy of cre-

dence. *Konowitz*, 965 F.2d at 232–33; *LaMontagne*, 750 F.2d at 1409. At all times, the plaintiff retains the ultimate burden of persuasion that she was the victim of intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

## II. *Tibbitts' Claim of Discrimination Based on her Termination*

In the instant case, Van Den Bergh does not dispute that Tibbitts can establish a *prima facie* case of discrimination with respect to her discharge. Van Den Bergh contends, however, that its decision to terminate Tibbitts was based on a legitimate nondiscriminatory justification—namely, Dudzik's evaluation of the accounting/finance department positions and his analysis that Tibbitts' job duties could be eliminated or redistributed to the other accounting department personnel. Van Den Bergh further contends that Tibbitts fails to raise a genuine issue of material fact as to whether the proffered justification is merely a pretext. In opposition to Van Den Bergh's motion, Tibbitts submits evidence of an age-related remark made by Dudzik that reflects age-based animus; evidence refuting the Dudzik's proffered justifications for terminating her; and, evidence that Van Den Bergh failed to consider her for rehire after another employee left the accounting department.

### A. *Dudzik's Age–Related Remark*

Tibbitts asserts that at some point in time prior to her termination [3], Dudzik remarked, "We've got to get rid of these old gals and get some young gals in here." Tibbitts Dep. at 123–24. Tibbitts testified that at the time of the remark, she assumed Dudzik was joking, Tibbitts Dep. at 120, 121, but at the present time she does not know whether or not he was joking. *Id.* at 124. Tibbitts could not recall the context in which the remark was made. *Id.* at 123.

---

**3.** Tibbitts could not remember the precise date or year but she testified that it was "a couple of years" before the decision to terminate her. Tibbitts Deposition at 121. Betty Damon, who also testified about Dudzik's remark, could not recall when the remark was made but stated that it was when Dudzik was acting as controller. Damon

Dep. at 25. Dudzik testified that he was controller until 1989. Tibbitts was terminated in October 1990. Thus, resolving the uncertainty in favor of Tibbitts, the court will assume that the remark was made approximately one to two years prior to Tibbitts' termination.

Betty Damon also testified as to the remark. Damon could not recall the exact wording of the remark but testified that it was "something about the old ladies of the accounting department," Damon Dep. at 25. She could not recall whether the remark included a reference to bringing in some "young ladies" but stated that it might have. Damon Dep. at 26. Damon also thought the comment was made jokingly. Damon Dep. at 27.

Dudzik denies ever making any such remark. Dudzik Affidavit ¶ 11. On a motion for summary judgment the court's function is not to weigh evidence or judge credibility; the evidence is to be construed in a light most favorable to the nonmoving party. Accordingly, for purposes of ruling on Van Den Bergh's motion for summary judgment, the court must assume that Dudzik made the alleged remark.

The Seventh Circuit has repeatedly cautioned that isolated remarks made in the workplace, by themselves, do not suffice to establish a genuine issue as to pretext unless the remarks are made relatively contemporaneously with the adverse employment action and are related to that action. *See, e.g., Hong v. Children's Memorial Hosp.,* 993 F.2d 1257 (7th Cir.1993); *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1116 (7th Cir.1992); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991). However, the remarks that were the subject of these Seventh Circuit opinions were markedly different than that attributed to Dudzik.

In *Hong,* the plaintiff testified that her supervisor had told her to "learn to speak English." 993 F.2d at 1265. After noting that "[e]vidence of a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to support a claim [of discrimination]," *id.* at 1266, the Seventh Circuit held that the plaintiff had failed to demonstrate the requisite nexus between the remark and the plaintiff's termination. In

*Rush,* the plaintiff asserted that her supervisor made statements that reflected antipathy towards blacks. 966 F.2d at 1115. The Seventh Circuit found this evidence insufficient to raise a genuine issue of material fact as to pretext because the plaintiff failed to show that her supervisor's racial animus was the cause of the decision to terminate her. *Id.* at 1117. Similarly, in *McCarthy,* the Seventh Circuit found that the plaintiff had failed to present a evidence of discrimination where racist remarks attributed to the plaintiff's supervisors were unrelated to the plaintiff's firing. 924 F.2d at 687.

In these Seventh Circuit cases, the remarks were, at best, remarks that reflected a general animosity toward the protected class; the remarks did not even remotely relate to a personnel action such as discharge or discipline. In marked contrast, Dudzik's remark relates directly to a termination decision. Dudzik's remark can reasonably be inferred to reflect both age-based animus and a desire, if not an intent, to eliminate older women from the accounting department. The logical relationship between the remark and Tibbitts' termination could not be more clear: Dudzik spoke of his desire to "get rid of the older gals" and Tibbitts was gotten rid of. Under these facts, the court finds that Dudzik's remark was sufficiently related to Tibbitts' termination.

Dudzik's remark was not made contemporaneously with Tibbitts' termination. However, in light of the nature and circumstances of the remark, this lack of contemporaneity does not preclude the remark from raising a genuine issue of material fact as to discriminatory intent or pretext. This court does not read the Seventh Circuit's opinions involving so-called "stray remarks" as setting forth a bright line test to be rigidly and mechanically applied regardless of what injustice might result. There are surely instances—and this case is among them—where contemporaneity cannot be considered a determinative factor.[4] As far as can be discerned from the record,

---

4. This is, perhaps, most clearly illustrated by the case of a racist employee who asserts, "If I ever become boss I'm going to fire all the African Americans." In the event that the employee becomes boss in two years and African American employees are fired shortly thereafter, it would work an extreme injustice to hold the remark insufficient to raise a genuine issue as to discriminatory intent based on the fact that the remark and the terminations were not contemporaneous. Dudzik's remark differs only by a shade.

Dudzik was not in a position to effect Tibbitts' termination at the time he made his remark; the lack of contemporaneity between the remark and the termination simply reflects this fact. A factfinder could reasonably find that it was not until Dudzik was given the opportunity to make personnel recommendations that he was able to act on his discriminatory animus.

If Dudzik's remark was the *only* evidence proffered by Tibbitts, deciding whether she had adduced sufficient evidence to raise a genuine issue as to pretext would be a very close call. However, as discussed below, Tibbitts offers more. In determining whether Tibbitts presents sufficient evidence to raise a triable issue, the court considers the totality of the evidence rather than evaluating each portion piecemeal. *Cf. Moffett v. Chicago Transit Authority,* 1994 WL 127711 (N.D.Ill.1994) (finding that remarks, which taken alone were, at best, tenuous evidence of age animus, raised a genuine issue as to age animus when viewed in conjunction with the fact that employee was replaced by a younger woman). The court finds that Dudzik's remark, when considered in conjunction with Tibbitts' evidence refuting the proffered reasons for her termination and the evidence that she was not considered for rehire into a position that was filled by a younger, arguably less qualified woman, raises a genuine issue of material fact as to age-based animus and pretext.

### B. Dudzik's Inconsistencies

Tibbitts also attempts to establish pretext by identifying certain inconsistencies between Dudzik's analysis of the accounting department job duties—which served as the foundation for his determination as to what positions could be eliminated—and his deposition testimony. In particular, Tibbitts points to Dudzik's testimony that: (1) one of the primary reasons that Tibbitts' position could be eliminated was that the "downtime" or "idle-time" reports which she prepared were going to be eliminated and preparation of these reports was Tibbitts' most time-consuming task; and, (2) Tibbitts' position had no "core activity."

Tibbitts attacks this testimony by referring to Dudzik's written memorandum detailing his job analyses in which he described Tibbitts' tasks:

—Codes and batches accounts payable vouchers—*three to four hours per day*
—Matches output of check copies with vouchers
—Prepares interhouse group billings for all shipments from plant
—Prepares weekly and monthly downtime reports—*one hour each day*
—Prepares accrual and standard journal entries at month end
—Reconciles accounts
—Does month end closing of dump stock
—Types hand checks as required

Plaintiff's Appendix, Exhib. H at 8 (emphasis added). Tibbitts argues that Dudzik's memorandum plainly reveals Dudzik's awareness that preparation of the downtime reports took at most one hour per day, and that, like any other position, Tibbitts' position involved a task that occupied a significant portion of the day—a "core activity." Tibbitts contends that this evidence refutes Dudzik's articulated justification for terminating her and raises a genuine issue as to pretext.

Dudzik testified that one factor relevant to his determination that Tibbitts' position could be eliminated was that task of preparing the downtime (also known as idle time) reports was to be eliminated. Dudzik Dep. at 61. Dudzik stated:

We were doing a report called an idle time report and that was very lengthy in preparation. Prior management used it extensively. Current management did not want it at all.

I said okay, there is one of the things which was significant work and time and energy, we can eliminate that. That was being performed by the chief clerk.

*Id.* Dudzik estimated that preparation of these reports took "a couple hours a day," *Id.* at 69–70, 90, and, at one point, Dudzik characterized this task as the "core activity" of the Chief Accounting Clerk, *id.* at 88, and the task that took the majority of Tibbitts' time. *Id.* at 91. As Tibbitts contends, this deposition testimony is flatly inconsistent with his

written analysis of Tibbitts' position which attributed only one hour per day to the task. Moreover, Tibbitts testified that, actually, the task took only thirty to forty-five minutes each week plus an hour or two at the end of the month. Tibbitts Dep. at 134–36. Accordingly, Dudzik's reliance on this factor is open to question.

Tibbitts' also attacks Dudzik's testimony that another factor justifying her termination was that her position had no "core activity." Tibbitts argues that her position was no different from any other position with respect to the existence or not of a "core duty"; hence Dudzik's justification is pretextual. Dudzik's memorandum attributes "three to four hours per day" to Tibbitts' task of coding and batching accounts payable vouchers. Indeed, this is quite comparable to Tibbitts' own estimate of the task; Tibbitts testified that she spent approximately "two and a half days" per week coding the vouchers, Tibbitts Dep. at 39–41. Mary Ann Clark, Tibbitts' immediate supervisor, testified that coding the vouchers consumed approximately sixty percent of Tibbitts' time. Clark Dep. at 37. Accordingly, Tibbitts argues that, under Dudzik's definition of a core activity as "something in excess of 50, 60, some 70 percent, somewhere in there," Dudzik Dep. at 89, coding and batching the vouchers constituted a "core activity." Again, Dudzik's reliance on the absence of a "core activity" is open to question.

Finally, a comparison of the job analyses in Dudzik's memorandum fails to reveal any significant difference between Tibbitts' position and certain other positions that were not eliminated, with respect to whether they involved one central task or multiple tasks. For instance, Dudzik described the Keypunch Operator as involving a variety of tasks (*e.g.*, takes inventory of blank checks and other accounting documents, files shipping copy of bills of lading, handles credits for returned goods) in addition to spending "½ day each day" keypunching input data. The Accounts Payable Clerk was also described as involving several tasks (*e.g.*, maintains petty cash and postage meter, handles outbound mail, reconciles miscellaneous receivables account—two hours per month, summarizes daily package production and

daily bank drafts) in addition to spending "½ day, each day" working with invoices. Tibbitts' position, as characterized in Dudzik's memorandum involved one task that took three to four hours per day (approximately half of the 7.5 hour workday) and several other tasks. In view of the similarities between these positions, a factfinder could reasonably give little credence to Dudzik's attempt to set apart Tibbitts' position as a catch-all position that was "designed to pick up many multiple tasks." Dudzik Dep. at 61. Most, if not all, of the positions involved many varied small tasks; Tibbitts' position does not stand alone in this regard. A factfinder could, therefore, reasonably find Dudzik's assertion that Tibbitts' position was easiest to redistribute open to doubt.

Taken collectively, the evidence presented by Tibbitts regarding the inconsistencies in Dudzik's testimony regarding the justifications for eliminating her position—in conjunction with Dudzik's alleged age-related remark and the evidence discussed below regarding Van Den Bergh's failure to consider Tibbitts for rehire—can support a reasonable finding that Dudzik's proffered justifications were not the real reasons motivating his decision.

■ It should be emphasized that the court is not second-guessing Dudzik's determinations as to which position could be redistributed among the other employees most easily. The court is cognizant that a federal court hearing a discrimination case "does not sit as super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464–65 (7th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Indeed, if Dudzik's inconsistencies regarding the amount of time spent on various tasks were the only evidence adduced by Tibbitts, the court would find that showing a very slim reed upon which to establish pretext. However, this evidence must be considered in conjunction with Tibbitts' other evidence of discrimination and when this is done a factfinder could reasonably infer pretext and discriminatory animus.

### C. Van Den Bergh's Failure to Rehire Tibbitts

Finally, Tibbitts contends that Van Den Bergh's failure to consider Tibbitts as a replacement for Damon—upon Damon's retirement—provides further evidence that Van Den Bergh's justification for terminating her was pretext.

Tibbitts presents substantial evidence that she was qualified to fill Damon's position; indeed, Tibbitts was Damon's back-up when she was away from the office. Cole Dep. at 59, 62; Damon Dep. at 28–29. Chris Cole, Director of Human Resources at the Joliet facility, testified that he was aware of no factors that would preclude Tibbitts from taking over Damon's position, Cole Dep. at 62, and Damon testified that Tibbitts "knew [Damon's] job very well" and performed Damon's functions competently. Damon Dep. at 11–14, 17. Damon also testified that Tibbitts was more qualified to fill her position than the "temp" who Damon trained to fill the position—a woman approximately sixteen years younger than Tibbitts—and who was ultimately hired as an permanent employee. *Id.* at 21–22.

Van Den Bergh contends that its failure to rehire Tibbitts cannot be construed as circumstantial evidence of discriminatory animus or pretext because it is undisputed that: (1) the job was already filled by the time Tibbitts submitted a letter requesting that she be considered for the position; and, (2) Van Den Bergh maintained a policy that former employees could not be rehired without the express written consent of the Senior Vice President of Human Resources. Defendant's Reply at 8 n. 6.

However, it is also undisputed that at the time that Tibbitts submitted her letter, Damon's position was occupied by a "temporary" employee who was not extended a formal offer of permanent employment until several months later. Defendant's Facts ¶¶ 60, 61. Also, Van Den Bergh's personnel policy merely requires the consent of the Senior Vice President; it does not prohibit rehire. Cole's testimony suggests that he asked Dudzik to follow up on Tibbitts' request to be considered for Damon's position. Cole Dep. at 61. When Cole asked Dudzik if he had followed up, Dudzik stated that he did not indicating that he did not have time. Cole Dep. at 62. Although Dudzik testified that Cole did not ask him to follow up but instead indicated that he would handle the matter locally, Dudzik Dep. at 54–59, the court must resolve this uncertainty against Van Den Bergh and conclude that Dudzik just let Tibbitts' request sit. As far as can be discerned form.the record, Neither Dudzik nor anyone else at Van Den Bergh ever attempted to secure the Senior Vice President's authorization. Thus, the policy is largely irrelevant.

In light of the evidence suggesting Tibbitts' superior qualifications for the position and the fact that the woman hired to fill Damon's position was younger than Tibbitts, in conjunction with all the other evidence previously discussed in this opinion, a reasonable factfinder could infer discriminatory animus from Van Den Bergh's failure to consider Tibbitts for rehire and view this failure as circumstantial evidence of pretext.

 Accordingly, the court finds that the totality of the evidence presented by Tibbitts raises a genuine issue of material fact as to whether Dudzik's proffered justification for terminating her was a pretext for discrimination. Therefore, Van Den Bergh's motion for summary judgment must be denied.

### CONCLUSION

Van Den Bergh Foods Company's motion for summary judgment [34–1] is denied. Status hearing set for Aug. 2, 1994.