Rita GALVIN, Plaintiff,

v.

CATHOLIC BISHOP OF CHICAGO, Defendant.

No. 93 C 3171.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 20, 1994.

---

Timothy Joseph McGonegle, Law Offices of Andrew J. Maxwell, Randall C. Romei, Ashcraft & Ashcraft, Ltd., Chicago, IL, for Rita Galvin.

James W. Gladden, Jr., Danuta Bembenista Panich, Barry A. White, Angela K. Dorn,

Mayer, Brown & Platt, Chicago, IL, for Catholic Bishop of Chicago.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Rita Galvin filed this three-count complaint, alleging violations of Title VII, as well as two state law claims. Presently before the court is defendant Catholic Bishop of Chicago's motion for summary judgment. For the reasons set forth below, Catholic Bishop's motion is granted as to Galvin's Title VII claim, and the remainder of her complaint is dismissed.

### I. Background [1]

Plaintiff Rita Galvin is a female Hispanic who was employed by defendant Catholic Bishop of Chicago from September 17, 1984 until her termination in February, 1991. Galvin initially served as Supervisor of Records Services in the Pastoral Center, the Catholic Bishop's administrative office. In 1986, Galvin was reassigned to the Information Resources department, which oversees computer operations, serving as a manager. She was promoted to the position of manager of Management Information Systems in 1989, and reported to Jack Benware, who was Director of Administration Services and Chief Financial Officer. Galvin's relationship with Benware was not always harmonious.[2] For example, in October, 1990, the Archdiocese held a "Town Hall Meeting" for its employees, in which the employees were invited to ask questions of a panel regarding potential cutbacks in personnel being considered by the Archdiocese. Galvin asked what effect the cutbacks would have on employee benefits. The question was referred to Benware, who answered the question in some detail.

---

**1.** The following facts are taken from the parties affidavits, deposition testimony, statements filed pursuant to Local Rules 12(m) and 12(n), and the stipulations entered into by the parties and filed as part of the pretrial order. As discussed further in section III below, Galvin has, in several instances, contradicted her deposition testimony or stipulated facts in the affidavit she filed in response to Catholic Bishop's motion for summary judgment, prompting motions to strike by Catholic Bishop. We shall address the merits of defendant's motions in section III as necessary, although our resolution of certain of those issues will undoubtedly be obvious from the facts we include in this section.

**2.** Indeed, as discussed further below, it appears that Benware generally had a very aggressive management style, and not infrequently raised his voice or openly criticized staff members, both male and female.

The following day, Benware attempted to reach Galvin on the telephone, but Galvin was out of the office, and no one in her department answered the phone. Upset that the phones were unattended, Benware spoke first with Galvin's secretary, who in turn informed Galvin that Benware was very angry. Galvin called Benware, and Benware berated Galvin for instructing a temp in the office not to answer the phone. The conversation deteriorated, and the topic turned to Galvin's question at the meeting. Benware accused Galvin of "putting him on the spot" by asking the question, and told her she should have asked him privately. Galvin countered that the question was totally appropriate, and that his tone with her was unacceptable. Benware then stated, "Lady, I'll chew your ass out any time I want." Galvin then told Benware that the two of them had to meet with Father Spiess, the Vicar for Administration of the Chicago Archdiocese and Benware's boss. Benware suggested that Galvin was attempting to go above his head, or behind his back, to Spiess, as she had previously done with Spiess' predecessor, Father James Roache. Benware then instructed Galvin to be in his office on the following Monday at nine o'clock.

The following Monday, Galvin met with Benware in his office. Benware had also invited Fred Van Den Hende, the Director of Employee Services for the Chicago Archdiocese. Benware informed Galvin that she had used poor judgment as a manager in asking the question at the Town Hall Meeting. She disagreed, stating again that she had the right to ask any question she wanted. Benware told her to be quiet and listen. Galvin responded that she would not remain quiet when Benware was wrong. She stated that she did not intend to embarrass him at the meeting, and that she would not take his abuse. Benware stated that he and Galvin would have to agree to disagree. Nothing further came of the incident, and it was not mentioned again by either party.

In early 1991, the directors of the various departments, including Benware, met at Mundelein College to discuss possible reductions in jobs and programs. Among the suggestions made by Benware was that Galvin should be terminated as she was not technically trained or skilled, and replaced with someone who could handle both technical and administrative functions. The recommendation was adopted without objection. As a result, Benware informed Galvin on February 20, 1991, that she had been terminated as part of the reduction-in-force (RIF).[3] This was confirmed by a letter sent to Galvin on February 26, 1991. Benware subsequently appointed one of the MIS staff members, Gang Chen, to Acting Manager, and then promoted Chen to Manager. In this capacity, Chen performed both the administrative tasks which Galvin had performed, as well as the technical functions he had previously been responsible for.

On December 10, 1991, Galvin filed an EEOC charge. After an investigation, the EEOC issued a determination concluding that "the evidence obtained during the investigation does not establish a violation of the statute," and informing Galvin of her right to sue. Galvin filed the present suit on May 26, 1993, alleging violations of Title VII, 42 U.S.C. § 2000e et seq., and two pendent state claims.

## II. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this,

---

**3.** The RIF resulted in the release of over forty Archdiocese employees. In the MIS department, four employees, including Galvin were terminated. Before the RIF, the department had twelve employees: six minorities and six non-minorities, seven women and five men. After the RIF, the department had eight employees: four minorities and four non-minorities, five women and three men.

the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

### III. Discussion

Galvin claims that she was discharged by Benware because of her gender and race. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the appropriate analytical framework for Title VII cases.[4] Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of gender or race discrimination. Chicago Bishop has impliedly admitted, at least for the purposes of this motion, that Galvin is able to satisfy this burden. The burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." *Id.,* 411 U.S. at 802, 93 S.Ct. at 1824.[5] In their pretrial order, the parties included the following stipulation:

> In both the oral and written communications, Galvin was informed that her termination was part of a reduction-in-force and stemmed from the redefinition of the position of MIS Manager to encompass technical functions requiring someone with strong technical expertise in hard and soft ware and computer programming. Galvin was further informed that the aforesaid redefinition of the MIS Manager's job resulted in the elimination of her administrative job.

It is therefore apparent that Chicago Bishop has satisfied its obligation under this portion of the *McDonnell Douglas* framework. *See*

*Dale v. Chicago Tribune Co.,* 797 F.2d 458, 463–64 (7th Cir.1986) (defendant satisfied burden of production in Title VII action where record demonstrated that defendant terminated plaintiff "because [defendant] no longer viewed [plaintiff] as qualified to fulfill his obligations"), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987).

We now turn to the final element of the *McDonnell Douglas* analysis. The burden shifts back to the plaintiff to rebut the defendant's proffered explanation by proving that the "legitimate" reason was merely a pretext for discrimination. *Id.,* 411 U.S. at 804, 93 S.Ct. at 1825. At this stage, the plaintiff must persuade the court that the defendant's explanation is "unworthy of credence" or that "a discriminatory reason more likely motivated" the defendant. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). As in most discrimination cases, this is where the parties in the present dispute focus most of their attention. Galvin identifies several occurrences which she claims supports her assertion that her termination, pursuant to the RIF, was actually a pretext for discrimination. We shall consider each in turn.

Galvin first claims that she possessed the technical skills necessary to run the MIS department, and that she performed technical functions as the need arose. Indeed, she asserts that she had "the most relevant skills" of anyone in the department. Accordingly, she disputes that her position was "redefined" to include more technical aspects, since she already possessed the skills required. This line of argument, however, advanced in Galvin's brief and affidavit in response to Catholic Bishop's motion for summary judgment, is largely preempted by Galvin's deposition and the stipulations included in the final pretrial order. Specifical-

---

4. Galvin asserts that the present action is a "mixed motive" case, and thus more properly analyzed under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). However, the *Price Waterhouse* analysis only applies when a plaintiff has introduced direct evidence of discrimination. *See id.,* 490 U.S. at 276, 109 S.Ct. at 1804 (O'Connor, J., concurring); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir.1991). As Galvin admits,

she has no direct evidence of discrimination. Accordingly, we shall utilize the more familiar burden shifting approach of *McDonnell Douglas.*

5. The defendant's burden in this regard is merely one of production; the burden of persuasion remains with the plaintiff. *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985).

ly, among the stipulations in the pretrial order are the following:

9. Galvin's duties as MIS Manager were administrative in nature.

10. Galvin did not possess technical expertise in computer programming, software or hardware.

11. Galvin had no formal education in computer science and does not have a college degree. Prior to her termination by Bishop, Galvin had taken no business or computer related college courses.

12. At the time of her termination, Galvin had taken only [three] three day-seminars offered by computer suppliers of the Archdiocese.

13. Galvin delegated technical issues to her staff which included one Gang Chen.

. . . .

16. Staff members at the Pastoral Center looked primarily to Chen for technical assistance.

. . . .

28. As the acting manager and subsequently MIS Manager, Chen continued to perform his former duties as senior programmer/data processing

supervisor in addition to assuming the administrative functions which had been performed by Galvin.

These stipulations are supported by Galvin's deposition testimony. It is well established that a party opposing a motion for summary judgment can not defeat that motion by creating factual issues through affidavits which contradict prior sworn statements. *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir.1985).[6] We shall therefore disregard Galvin's current statements, and rely instead upon her deposition testimony and the stipulations jointly offered by the parties. Relying upon those documents, it is apparent that Galvin's challenge falls short. In the recommendation at the Mundelein Conference, Benware noted that Galvin was not technically competent, and suggested that her position be redefined to encompass both managerial and technical functions. He further noted that this could allow the Archdiocese to eliminate one technical person from the MIS department.[7] This proffered reason for Galvin's termination is not contradicted or called into question by any relevant evidence regarding Galvin's technical skills or her role as MIS Manager. We therefore reject Galvin's argument to the contrary.[8]

6. There is a limited exception to this rule when the deponent was confused at the time of the deposition and uses the affidavit to explain the confusion, or when the affiant lacked access to material facts at the deposition, and the affidavit identifies the relevant evidence. *See Miller*, 766 F.2d at 1104. Galvin does not assert that she was confused at the time of her deposition, or in entering into the stipulations, or that she lacked relevant facts. Accordingly, her current self-serving statements which contradict her deposition and stipulations are stricken.

7. Galvin also suggests in her brief that, "[i]f anything, Benware may have intentionally misled members of the Cardinal's Cabinet at the Mundelien [sic] meeting" regarding Galvin's position as head of the entire MIS department. In support, she relies upon the deposition of Father Kevin Spiess, who testified that he did not recall Benware making any reference to the redefinition or elimination of Galvin's position, and recalled references to Galvin's termination in connection with the elimination of the Learning Center, rather than as manager of the entire MIS department. However, Spiess also stated that he was new to his position, and did not have a clear understanding of many people's jobs. In addi-

tion, he acknowledged that his secretary typed up notes of the meeting. Those notes clearly indicate that the "M.I.S. Manager" was not technically competent, and should be replaced with a technically competent person. This recommendation was listed separately from the proposal to eliminate the Learning Center. In any event, Galvin can not defeat Catholic Bishop's motion for summary judgment by engaging in conjecture about what Benware "may have" said at the conference. *See Karazanos v. Navistar Int'l Transp. Co.*, 948 F.2d 332, 336 (7th Cir.1991).

8. Galvin also denies in response to the present motion that her termination was authorized at the Mundelein Conference. However, she has stipulated that "Benware proposed Galvin's termination as one of several cost cutting measures at the Mundelein Conference" and that "[n]o disagreement with Benware's proposal relating to Galvin was express by the attendees at the Mundelein conference so that the decision to terminate her employment was finalized as of the conclusion of said conference on January 17, 1991."

Galvin next asserts that Benware's discriminatory animus is evident from the fact that he promoted Gang Chen to the redefined position of Manager of the MIS department, instead of two female MIS employees who, according to Galvin, had superior credentials. We initially observe that Galvin's assertion is simply not supported by the evidence. A comparison of the resumes of each of the three individuals indicates that Chen was the only one who had responsibility for an entire computer system; in addition, he had previously managed three microcomputer labs. At the Archdiocese, Chen had supervisory responsibility for Data Processing and System 38 Operations. Of the two female employees, only Janina Stec had supervisory responsibilities, and the three persons she oversaw were eliminated pursuant to the RIF. Indeed, Chen's degree was in Computer Information Systems and Management, while the two female employees' degrees were limited to Computer Science. Finally, Galvin herself rated Chen above average in "supervisory skills," and excellent in "leadership," giving him an overall rating of "excellent." In any event, the technical skills of the two female employees does not change the fact that Galvin lacked such qualifications, and that it was this fact which led to the elimination of the solely administrative managerial position.[9]

Galvin next asserts that various encounters she had with Benware support her claim that his proposal to terminate was gender or race based. The first relates to Galvin's role as liaison to representatives from Price Waterhouse who were conducting a study of the Pastoral Center's efficiency. Benware appointed Galvin to the position in late 1989. He subsequently removed her from the position because various employees expressed concern that their statements to the Price Waterhouse representatives might be relayed by Galvin to Reverend James Roache, who had managerial control over the Pastoral Center, and with whom Galvin was perceived to have some ties or connection.[10] Galvin's primary objection does not appear to be that she was removed, but the manner in which Benware removed her. Specifically, she claims that he accused her of being "disloyal" to him, and instead suggested that she was "loyal" to Father Roache, who was Benware's superior. Galvin asserts that it was "harassing, belittling, and humiliating" that she should be called upon to indicate her loyalty "to one male over another male."[11] She raises a similar claim with respect to Benware's reaction to her question at the Town Hall Meeting.

However, Benware's actions and statements, even if accurately retold by Galvin, do not support Galvin's claim that Benware was sexist, and discriminated against her in proposing her termination. Galvin has cited no authority to suggest that requiring

9. Galvin similarly asserts, as more fully addressed in Count II of her complaint, that Catholic Bishop's failure to post the position of Office Service Manager and its hiring of a non-Hispanic male, Daniel Summins, for the position violated the Pastoral Center Employees' Handbook, and was designed "to thwart any attempt by [Galvin] to be considered" for the position. However, it is undisputed that Summins was hired before Galvin was terminated, that Galvin had never expressed interest in the position (as clearly indicated in Galvin's deposition and the pretrial order stipulations), and that only Summins was even considered for the position. In short, the circumstances surrounding Summins' hiring simply do not support Galvin's claim of discrimination.

10. Galvin states that Benware did not inform her that this was the reason for her removal, but she offers no evidence to contradict his assertion that it was, in fact, the reason. On the contrary, she suggests that there might be grounds for such

concern by her statement that "[t]here is no reason why anything discussed before me while [I] acted as the liaison with the Price Waterhouse committee could not have been openly discussed with the Vicar General of the Archdiocese of Chicago, Fr. Roache, because everything discussed was for the good of the Archdiocese," although she denies that she actually related any employee's statement to Roache. Reverend Roache was relieved of his duties at the Pastoral Center following completion of the Price Waterhouse study.

11. Galvin also claims that Benware never demanded "loyalty" from the male managers who reported to him. This statement, however, like many proffered by Galvin, is unsupported by any evidence, and Galvin herself is not competent to testify to that fact. Although we question the relevance of Galvin's assertion in any event, as discussed further above, it is not properly before us, and is therefore stricken.

loyalty from an employee is somehow sexist or discriminatory. While Benware may have been paranoid, demanding, and less than tactful, such behavior was not discriminatory unless it somehow related to Galvin's gender or race. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and § 1981 do not interfere ... [u]nless [plaintiff]'s race mattered....") (citation omitted), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Laird v. Cragin Federal Bank*, No. 92 C 8441, 1994 WL 13662, at *4–*5 (N.D.Ill. Jan. 18, 1994) (disagreements with employer and demanding, unpleasant boss do not provide basis for Title VII claim absent discriminatory animus). Galvin has failed to demonstrate that it was. On the contrary, Catholic Bishop has offered the affidavits of two non-Hispanic males, both of whom aver that Benware has criticized them in front of others, and that they have seen him treat other staff members in the same manner. In addition, Fred Van Den Hende, the Director of Employee Services for the Chicago Archdiocese, states that Benware is "not always the easiest man to work for," and that Benware sometimes raised his voice to him. In short, the evidence suggests that Benware was equally demanding and contentious with much of his staff, regardless of race or gender.[12] As a result, Galvin's recitation of Benware's statements, which are not facially discriminatory, does little to support her claim.[13]

▄▄▄ Finally, Galvin relates that in the summer of 1989, Benware invited all of the managers who reported to him to his home for a picnic. When the conversation turned to a golfing tournament on television, Galvin suggested that women should have social activities on some working days, just as men went golfing. Benware allegedly responded, "It is bad enough we have to put up with women in the office let alone on the golf course." Galvin claims that this is evidence of sex stereotyping, and that it bolsters her claim that she was fired because of her gender. It is well established, however, that stray gender or race-related remarks only support a claim of discrimination when they are contemporaneous with and related to the decision to terminate the employee. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 (7th Cir.1992). Benware's alleged comment, made in a social setting approximately one and one-half years prior to Galvin's termination, is simply not probative of discrimination.

▄▄▄ In a last ditch effort to save her dying lawsuit, Galvin states that she had previously been removed from a position in Record Management at Catholic Bishop after it was "redefined," and that action had been preceded by sexual harassment. We initially question the relevance of this allegation. The crux of Galvin's "pretext" argument is that Benware contrived the reasons offered for her termination, and effectively duped the Mundelein Conference participants. However, since Benware was not employed by the Archdiocese at the time of the alleged harassment, it is unclear how Galvin's recitation of earlier discrimination is at all probative of Benware's intentions. Furthermore, even Galvin admits that, after her position in Record Management was redefined and given to a non-Hispanic male, she was *promoted* to her position in Information Services, which became MIS. Finally, Galvin admits in her

---

12. Furthermore, as noted above, Benware's concerns about Galvin's connections to Father Roache do not appear to be entirely unfounded. Indeed, Galvin admitted in her deposition that, contrary to her representation to Benware, she did on occasion go directly to Roache without telling Benware. Furthermore, she admits that she spoke to Roache about her removal from the post of liaison to the Price Waterhouse team.

13. We also note that Benware's reference to Galvin as "lady" in rebuking her does not alter this conclusion. Indeed, Galvin apparently recognizes that this term is insufficient to support a claim of discrimination, since she transforms it, without explanation, to "little lady" in her memorandum in opposition to Catholic Bishop's motion for summary judgment, contrary to her own affidavit, Local Rule 12(n) statement, and notes written soon after the encounter. In either event, such a statement is insufficient to raise a genuine issue as to Benware's discriminatory animus. *See Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1266 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994).

deposition that the alleged harassment was limited to two comments by and a confrontation with an elderly priest, whose views were not condoned by church officials; indeed, the priest was removed from his position following Galvin's complaints, and he died soon thereafter. As with the rest of the arguments forwarded by Galvin, her assertions of previous discrimination and harassment simply fail to support her Title VII claim. In sum, Galvin has failed to provide any evidence that Catholic's Bishop legitimate reason for terminating her was pretext for discrimination. Accordingly, Catholic Bishop is entitled to summary judgment.[14]

### IV. Conclusion

For the reasons set forth above, defendant Catholic Bishop of Chicago's motion for summary judgment is granted.[15] It is so ordered.

---

**14.** Given the above resolution of Galvin's Title VII claim, we dismiss her pendent state law claims pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966).

**15.** Catholic Bishop has also filed motions to strike various materials offered by Galvin in opposition to the motion for summary judgment. Except as specifically addressed above, those motions are denied as moot. We also deny Catholic Bishop's motion for sanctions pursuant to Fed. R.Civ.P. 56(g); Catholic Bishop may, however, raise this issue again in conjunction with any petition for bill of costs which it may submit in this matter.